UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHELE COLÓN, a New Jersey resident; | DOCKET NO. 1:16-cv-6938 |
| Plaintiff, | |
| | Civil Action |
| - against – | |
| ANDREW T. MILTENBERG, a New York resident; MARCO A. SANTORI, a New York resident; and NESENOFF MILTENBERG GODDARD LASKOWITZ, LLP, as successor-in-interest to Nesenoff & Miltenberg, LLP, | **COMPLAINT** |
| | **JURY DEMAND** |
| Defendants. | |

The Plaintiff Michele Colón (the "Plaintiff"), by and through her attorney, Paul S. Grosswald, by way of Complaint against the above-named Defendants, hereby alleges the following:

## INTRODUCTION

1.     This is an action for attorney deceit pursuant to New York Judiciary Law § 487.

2.     The Defendants, while representing their client, World Mission Society, Church of God a NJ Nonprofit Corporation ("World Mission New Jersey"), prosecuted a lawsuit against the Plaintiff.

3.     That lawsuit was World Mission Society, Church of God a NJ Nonprofit Corporation v. Colón, BER-L-5274-12, filed in New Jersey Superior Court, Bergen County, on or around July 11, 2012 (the "World Mission Case").

4.     During the course of the World Mission Case, the Defendants made a series of false representations to the court.

1

5.      Those false representations were made with the intent of deceiving the court and the Plaintiff into believing that the lawsuit had merit, when it actually had none.

6.      The Defendants' client, World Mission New Jersey, is the New Jersey branch of the World Mission Society Church of God, which purports to be a non-profit charitable church, but is actually a profit-making global enterprise (the "World Mission Enterprise" or "World Mission").

7.      The Plaintiff is a former member and outspoken critic of World Mission New Jersey.

8.      The Plaintiff was one of two defendants in the World Mission Case.

9.      Another critic of the World Mission Enterprise, Tyler Newton (who allegedly used the online alias "James Newton") ("Newton"), was named as a co-defendant in the World Mission Case.

10.     At the time, Newton owned a website that was critical of World Mission, called examiningthewmscog.com (the "Examining Website").

11.     World Mission New Jersey brought the lawsuit against the Plaintiff alleging defamation, false light invasion of privacy, and trade libel, arising mostly out of online postings.

12.     World Mission New Jersey brought the lawsuit for the sole purpose of silencing the Plaintiff's legal and truthful criticisms of the World Mission Enterprise.

13.     The Plaintiff began publicly criticizing the World Mission Enterprise after being a member of World Mission New Jersey for about a year.

14.     During that time, World Mission New Jersey systematically manipulated the Plaintiff and her husband until their relationship fell apart.

15.     The Plaintiff was subjected to intense pressure to spend increasing amounts of time with World Mission New Jersey, thereby putting a strain on her family relationships.

2

16.     World Mission New Jersey attempted to keep the Plaintiff and her husband sleep-deprived.

17.     When the Plaintiff protested against these abuses, World Mission New Jersey began to turn her husband against her, by claiming that the Plaintiff was being "used by Satan."

18.     World Mission New Jersey's pastor, Dong Il Lee ("Lee"), openly preached the view that "salvation" was a more important priority to World Mission New Jersey than preserving marriages, and that devotion to World Mission New Jersey was a requirement to achieve such salvation.

19.     As a result, the Plaintiff's marriage fell apart.

20.     The Plaintiff eventually came to realize that she was not the only one this was happening to.  She started realizing that many of the married members of World Mission New Jersey were ending up separated or divorced if one person in the marriage decided to no longer be a part of World Mission or openly criticized World Mission.

21.     After reading stories from other victims of World Mission New Jersey, the Plaintiff discovered "an obvious pattern" of families being torn apart.

22.     After conducting Internet research, the Plaintiff learned about "cults" that use "mind control" to manipulate and control their members.

23.     The Plaintiff subsequently formed the opinion that World Mission New Jersey is a "cult" that uses "mind control" and "destroys families."

24.     The Plaintiff wrote a Five-Part Story describing her experience, called "How the WMSCOG Turned My Life Upside Down" (the "Five-Part Story").

25.     The Five-Part Story was posted to the Examining Website.

26.     The Plaintiff also allegedly wrote an article criticizing the manner in which World Mission New Jersey received the Presidential Volunteer Service Award (the "PVSA Article").

27.     The PVSA Article was also posted to the Examining Site.

28.     The Plaintiff became an activist, advocating for victims of cults in general, and for victims of the World Mission Enterprise in particular.

29.     The Plaintiff began attending public meetings of the Ridgewood, New Jersey Planning Board where issues pertaining to World Mission New Jersey were being discussed.

30.     The Plaintiff also organized other members of the community to attend such meetings.

31.     The Plaintiff even testified in a child-custody trial where World Mission New Jersey's treatment of children was at issue.

32.     World Mission New Jersey was threatened by the fact that the Plaintiff was speaking out against it in so many different forums.

33.     Thus, in order to silence the Plaintiff, World Mission New Jersey filed the World Mission Case against the Plaintiff.

34.     In the World Mission Case, World Mission New Jersey claimed that the Plaintiff had defamed it in a variety of online and offline forums.

35.     The Defendants were not involved in the World Mission Case when it was first filed on or around July 11, 2012.

36.     Rather, the Defendant law firm, which was then known as Nesenoff & Miltenberg, LLP (the "Nesenoff Firm") substituted into the case on or around October 3, 2012, with a New Jersey attorney, Diana R. Zborovsky as the attorney of record.

37.   At the time that the Nesenoff Firm joined the case, the two Defendant attorneys, Andrew T. Miltenberg ("Miltenberg") and Marco A. Santori ("Santori") were ineligible to appear in a New Jersey court, because they were not licensed in New Jersey.

38.   On or around October 3, 2012, Miltenberg and Santori each made applications to appear in the World Mission Case on a pro hac vice basis.

39.   Both Miltenberg and Santori are licensed lawyers in New York.

40.   Both Miltenberg and Santori each relied on their respective New York licenses to support their applications to be admitted pro hac vice to the New Jersey court.

41.   Both Miltenberg and Santori submitted Certificates of Good Standing from the Appellate Division of the Supreme Court of the State of New York, First Judicial Department, in support of their applications to be admitted pro hac vice to the New Jersey court.

42.   On November 7, 2012, the New Jersey court hearing the World Mission Case issued an Order permitting Miltenberg and Santori to appear in the World Mission Case on a pro hac vice basis.

43.   Santori left the Nesenoff Firm some time in mid-2013, and was no longer involved in the World Mission Case after that.

44.   On February 9, 2015, the court in the World Mission Case granted summary judgment to Ms. Colón, the instant Plaintiff.

45.   Shortly after that, World Mission New Jersey fired the Defendants and obtained new lawyers.

46.   Due to the scheduling of post-summary judgment motions, World Mission New Jersey's time to appeal the summary judgment expired on September 16, 2015.

47.   World Mission New Jersey did not appeal the summary judgment.

48.   Thus, the Plaintiff prevailed in the World Mission Case as of September 16, 2015.

49.   Notwithstanding the fact that the Plaintiff ultimately prevailed, the deceit used by the Defendants to maintain the litigation caused the Plaintiff to incur significant legal fees, costs, and emotional damages.

50.   The Plaintiff now seeks to recover for those fees, costs, and emotional damages.

51.   The Plaintiff further seeks to treble the amount of damages, pursuant to New York Judiciary Law § 487.

## PARTIES

### Plaintiff

52.   The Plaintiff is an individual residing in New Jersey.

### Defendants

53.   Miltenberg is an individual who, on information and belief, resides in New York.

54.   Santori is an individual who, on information and belief, resides in New York.

55.   The Nesenoff Firm is a law firm with its principal place of business in New York.

56.   At all times in which the Nesenoff Firm was involved in the World Mission Case, it operated under the name Nesenoff & Miltenberg, LLP.

57.   The Nesenoff Firm presently operates under the name Nesenoff Miltenberg Goddard Laskowitz, LLP.

58.   On information and belief, Nesenoff Miltenberg Goddard Laskowitz, LLP is a successor-in-interest to Nesenoff & Miltenberg, LLP, and is fully liable for the wrongful acts committed by its predecessor.

## JURISDICTION AND VENUE

### Subject Matter Jurisdiction

59.   Plaintiff is a citizen of New Jersey.

60.   On information and belief, all of the Defendants are citizens of New York.

61.   There is complete diversity of citizenship between Plaintiff and Defendants.

62.   The amount in controversy exceeds $75,000.   In fact, the legal fee incurred by the Plaintiff as a result of the Defendants' conduct is well into the six figures.  The Plaintiff is also seeking to recover expenses and emotional damages, among other damages.

63.   Therefore, this Court has jurisdiction over all of Plaintiff's claims pursuant to 28 U.S.C. § 1332.

**Personal jurisdiction**

64.   This Court has personal jurisdiction over Miltenberg because, on information and belief, he resides in New York.

65.   This Court has personal jurisdiction over Santori because, on information and belief, he resides in New York.

66.   This Court has personal jurisdiction over the Nesenoff Firm because it has its principal place of business in New York.

**Venue**

67.   The Nesenoff Firm has its principal place of business in the Southern District of New York.

68.   Therefore, the Nesenoff Firm resides in the Southern District of New York, pursuant to 28 U.S.C. § 1391(d).

69.   All of the Defendants are residents of New York.

70.   Therefore, venue is proper in this Court under 28 U.S.C. § 1391(b)(1).

**FACTUAL ALLEGATIONS**

I.       **THE TWO COMPLAINTS FILED BY THE DEFENDANTS**

71.    At the time the Defendants entered the World Mission Case in the fall of 2012, a Complaint had already been filed against the Plaintiff by World Mission New Jersey.

72.    One of the first acts undertaken by the Defendants after they entered the World Mission Case was to file the First Amended Complaint ("FAC").

73.    The FAC was filed on or around January 28, 2013.

74.    The FAC contained Miltenberg's and Santori's names in the signature block.  The FAC was signed by attorney Diana Zborovsky, who at all times was an employee of the Nesenoff Firm and under the supervision and control of Miltenberg.  Miltenberg and Santori were attorneys of record when and after the FAC was filed, and were thus responsible for the accuracy and truthfulness of the FAC.  Both Miltenberg and Santori would have been authorized to withdraw or correct any false misrepresentations contained in the FAC.

75.    The Defendants then filed a Second Amended Complaint on or around April 24, 2013 ("SAC").

76.    The SAC contained Miltenberg's and Santori's names in the signature block.  The SAC was signed by attorney Diana Zborovsky, who at all times was an employee of the Nesenoff Firm and under the supervision and control of Miltenberg.  Miltenberg and Santori were attorneys of record when and after the SAC was filed, and were thus responsible for the accuracy and truthfulness of the SAC.  Both Miltenberg and Santori would have been authorized to withdraw or correct any false misrepresentations contained in the SAC.

77.     Both the FAC and the SAC were riddled with allegations that the Defendants knew to be false.

78.     Both the FAC and the SAC set forth a series of challenged statements, most of which were posted online, which the Defendants alleged had been made by Plaintiff.

79.     Both the FAC and the SAC claimed that the Plaintiff had engaged in online defamation of World Mission New Jersey, including on business review websites, on the website of cult expert Rick Ross, in a couple of YouTube videos, on Facebook, and in the Five-Part Story and in the PVSA Article.

80.     Both the FAC and the SAC alleged various causes of action including defamation, false light invasion of privacy, and trade libel.

## II.     THE DEFENDANTS DELIBERATELY EDITED THE CHALLENGED STATEMENTS TO MISLEAD THE COURT AND THE PLAINTIFF INTO BELIEVING THAT THE STATEMENTS WERE OF AND CONCERNING WORLD MISSION NEW JERSEY EVEN THOUGH THE DEFENDANTS KNEW THEY WERE NOT

81.     Each of World Mission New Jersey's causes of action required World Mission New Jersey to be able to prove, among other things, that the challenged statements were of and concerning World Mission New Jersey.

82.     As a matter of law, if the challenged statements referred to another branch of the World Mission Enterprise, they would not be actionable in a lawsuit brought by World Mission New Jersey.

83.     Also as a matter of law, if the challenged statements referred to "World Mission" generally, or to all of the World Mission entities as a group, without specific reference to World Mission New Jersey, they would not be actionable in a lawsuit brought by World Mission New Jersey.

84.   Yet, the Defendants knew that most of the challenged statements alleged in the FAC and in the SAC were not of and concerning World Mission New Jersey.

85.   Most of the statements were discussing World Mission as a group, or other branches of the World Mission Enterprise.

86.   Throughout the FAC and the SAC, the Defendants edited the challenged statements in order to deceive the Court and the Plaintiff into believing the challenged statements were of and concerning World Mission New Jersey, even though the Defendants knew that the statements were not of and concerning World Mission New Jersey.

87.   Prior to filing the FAC and the SAC, and at all times thereafter, the Defendants were in possession of the original versions of the challenged statements, as they appeared when posted online.

88.   Thus, the Defendants necessarily knew that the statements were not of and concerning World Mission New Jersey.

A.   **The Defendants Willfully Misrepresented the Text of the Business Review Statements to Mislead the Court and the Plaintiff Into Believing They Were Of and Concerning World Mission New Jersey When They Clearly Were Not**

89.   In ¶ 30(a) of the FAC, and in ¶ 30(a) of the SAC, the Defendants alleged that the Plaintiff had posted defamatory reviews of World Mission New Jersey on Local.com.  According to the Defendants, the Plaintiff stated that World Mission New Jersey is a "religious cult" that "destroy[s] families!!!" and that World Mission New Jersey "will destroy your family and take all of your money."  Yet, the statements in question were not referring to World Mission New Jersey.  Rather, the statements were referring to a World Mission entity located in Deer Park, Texas.

90.   In ¶ 30(b) of the FAC, and in ¶ 30(b) of the SAC, the Defendants alleged that the Plaintiff

posted statements on www.yellowbot.com, saying that World Mission New Jersey is a "religious cult" that "wil [sic][1] destroy your family and take all of your money," that World Mission New Jersey constitutes "Religious Fraud," and that "[m]any have had their marriages and families torn apart by this destructive mind control group." Yet, the statements in question were not referring to World Mission New Jersey. Rather, the statements were referring to a World Mission entity located in Santee, California.

91.     In ¶ 30(c) of the FAC, and in ¶ 30(c) of the SAC, the Defendants alleged that the Plaintiff posted statements on www.santee.patch.com or patch.com saying that World Mission New Jersey is a "religious cult" that "will destroy your family and take all of your money!!!" and that World Mission New Jersey "destroy[s] families!" Yet, the statements in question were not referring to World Mission New Jersey. Rather, the statements were referring to a World Mission entity located in Santee, California.

92.     In ¶ 30(d) of the FAC, and in ¶ 30(d) of the SAC, the Defendants alleged that the Plaintiff posted statements on www.findlocal.latimes.com saying that "[t]he World Mission Society Church of God[] .... deceive[s] people into listening to them" and that "the World Mission Society Church of God ... purposefully withhold[s] information in order to deceptively recruit." Yet, the statements in question were not referring to World Mission New Jersey. Rather, the statements were referring to a World Mission entity located in Los Angeles, California.

93.     In ¶ 30(g) of the FAC, and in ¶ 30(g) of the SAC, the Defendants alleged that the Plaintiff posted statements on www.socialcurrent.org saying that World Mission New Jersey is a "religious cult" that "destroy[s] families and rob[s] people of their money." Yet, the

---

[1] Typographical error comes from original challenged statement as posted.

statements in question were not referring to World Mission New Jersey.  Rather, the statements were referring to a World Mission entity located in Bloomingdale, Illinois.

94.    In ¶ 30(h) of the FAC, and in ¶ 30(h) of the SAC, the Defendants alleged that the Plaintiff posted statements on www.chamberofcommerce.com saying that World Mission New Jersey is a "religious cult" that "wil [sic][2] destroy your family and take all of your money."  Yet, the statements in question were not referring to World Mission New Jersey.  Rather, the statements were referring to a World Mission entity located in Santee, California.

95.    In ¶ 30(h) of the FAC, and in ¶ 30(h) of the SAC, the Defendants alleged that the Plaintiff posted statements on www.dexknows.com saying that World Mission New Jersey is a "religious cult" that "wil [sic][3] destroy your family and take all of your money."  Yet, the statements in question were not referring to World Mission New Jersey.  Rather, the statements were referring to a World Mission entity located in Deer Park, Texas.

**B.    The Defendants Willfully Misrepresented the Text of the Rick Ross Website Statements to Mislead the Court and the Plaintiff Into Believing They Were Of and Concerning World Mission New Jersey When They Clearly Were Not**

96.    In ¶ 33 of the FAC, and in ¶ 33 of the SAC, the Defendants alleged that the Plaintiff posted a statement on www.rickross.com (the "Ross Site") in which she stated that World Mission New Jersey lies about how the church was founded on its application for tax exempt status.  Yet, the statement in question was not referring to World Mission New Jersey.  Rather, the statement was referring to a World Mission entity in California.

97.    In ¶ 34 of the FAC, and in ¶ 34 of the SAC, the Defendants alleged that the Plaintiff posted the following statement on the Ross Site:

---

[2] Typographical error comes from original challenged statement as posted.
[3] Typographical error comes from original challenged statement as posted.

"Does the organization control or is it controlled by any other organization?". The WMSCOG checked off "NO". The WMSCOG locations are NOT independent and are all controlled by the main location in Seoul, S. Korea. Why would they answer "NO" to this question?

Yet, the statements in question were not referring to World Mission New Jersey. Rather, the statements were referring to a World Mission entity in Illinois.

98.    In ¶ 36 of the FAC, and in ¶ 36 of the SAC, the Defendants alleged that the Plaintiff posted a statement on the Ross Site in which she accused World Mission New Jersey of being "a destructive mind control cult." Yet, the statement in question was not referring to World Mission New Jersey. Rather, the statement was referring to a World Mission entity in Illinois.

**C.    The Defendants Willfully Misrepresented the Statements Contained in the "Destroys Families Video" to Mislead the Court and the Plaintiff Into Believing They Were Of and Concerning World Mission New Jersey When They Clearly Were Not**

99.    In ¶¶ 53-58 of the FAC, and in ¶¶ 53-58 of the SAC, the Defendants alleged that the Plaintiff posted to YouTube a video entitled "The World Mission Society Church of God - Destroys Families" (the "Destroys Families Video").

100.    In ¶ 54 of the FAC, and in ¶ 54 of the SAC, the Defendants alleged that, in the Destroys Families Video, the Plaintiff stated that "The World Mission Society Church of God uses mind control tactics on its members in order to tear them apart from their families." Yet, the statement in question was not referring to World Mission New Jersey. Rather, the statement was referring globally to all World Mission entities as a group.

101.    In ¶ 55 of the FAC, and in ¶ 55 of the SAC, the Defendants alleged that, in the Destroys Families Video, the Plaintiff stated that "The World Mission Society Church of God uses fear to prevent its members from going on vacation." Yet, the statement in question was

13

not referring to World Mission New Jersey.  Rather, the statement was referring globally to all World Mission entities as a group.

102.    In ¶ 56 of the FAC, and in ¶ 56 of the SAC, the Defendants alleged that, in the Destroys Families Video, the Plaintiff stated that "The World Mission Society Church of God uses sleep deprivation as a means to make their members more vulnerable to the indoctrination process."  Yet, the statement in question was not referring to World Mission New Jersey.  Rather, the statement was referring globally to all World Mission entities as a group.

103.    In ¶ 57 of the FAC, and in ¶ 57 of the SAC, the Defendants alleged that, in the Destroys Families Video, the Plaintiff stated that "Every waking moment must be focused on controlling the member's mind."  Yet, the statement in question was not referring to World Mission New Jersey.  Rather, the statement was referring globally to all World Mission entities as a group.

**D.    The Defendants Willfully Misrepresented the Statements Contained in the "Financial Info Video" to Mislead the Court and the Plaintiff Into Believing They Were Of and Concerning World Mission New Jersey When They Clearly Were Not**

104.    In ¶ 59 of the FAC, and in ¶ 59 of the SAC, the Defendants alleged that the Plaintiff posted a video to YouTube entitled "World Mission Society Church of God - Public Financial Info!" (the "Financial Info Video").

105.    In ¶ 60 of the FAC, and in ¶ 60 of the SAC, the Defendants alleged that, in the Financial Info Video, the Plaintiff stated that World Mission New Jersey "does not provide any form of financial disclosure to its members."  Then the Plaintiff allegedly asked, "So where does the money go?"  Yet, the statements in question were not referring to World Mission New Jersey.  Rather, the statements were referring globally to all World Mission

entities as a group, or to a World Mission entity in Illinois.

106.  In ¶ 60 of the FAC, and in ¶ 60 of the SAC, the Defendants alleged that, in the Financial Info Video, the Plaintiff stated that World Mission New Jersey denies to the IRS that "the organization has a direct business relationship through ownership of another entity."  Yet, the statement in question was not referring to World Mission New Jersey.  Rather, the statement was referring to a World Mission entity in Illinois.

107.  In ¶ 62 of the FAC, and in ¶ 62 of the SAC, the Defendants alleged that, in the Financial Info Video, the Plaintiff stated that she was reading an IRS filing from one of the Church's branches and noted that the form reports receipt of "a little over $26,000 from a, quote, parental church," while stating that this is suspect because the form did not also report a corporate subsidiary relationship to its parent church headquartered in South Korea.  In ¶ 63 of the FAC, and in ¶ 63 of the SAC, the Defendants asserted that such statement was false because World Mission New Jersey is not a corporate subsidiary of a parent Church.  Yet, the statement in question was not referring to World Mission New Jersey.  Rather, the statement was referring to an IRS filing made by a World Mission entity in Illinois.  The statement referred to the World Mission entity in South Korea being the parent corporation of the World Mission entity in Illinois, not the parent corporation of World Mission New Jersey.

108.  In ¶ 64 of the FAC, and in ¶ 64 of the SAC, the Defendants alleged that the Plaintiff stated that World Mission New Jersey had claimed "$300,000 in missionary expenses" in an IRS filing.  According to the Defendants, the Plaintiff then stated that World Mission New Jersey's members pay their own expenses when they do missionary work.  According to the Defendants, the Plaintiff's statements falsely implied that World

Mission New Jersey lied to the IRS about how this money was actually spent.  Yet, the statement in question was not referring to World Mission New Jersey.  Rather, the statement was referring to an IRS filing made by a World Mission entity in Illinois.  In fact, in the earlier iteration of the Complaint, filed prior to the Defendants joining the case, the IRS filing containing the reference to "$300,000 in missionary expenses" was described as having been filed by another World Mission branch.  Thus, the Defendants knew that the IRS filing came from another branch of World Mission, and they deliberately edited the FAC and the SAC to falsely represent to the court that the IRS filing came from World Mission New Jersey, in order to fraudulently strengthen their client's case.

109.    In ¶ 64 of the FAC, and in ¶ 64 of the SAC, the Defendants alleged that, in the Financial Info Video, the Plaintiff promised "[m]ore information on the WMSCOG's questionable business connections and tax filings to come."  In ¶ 64 of the FAC, and in ¶ 64 of the SAC, the Defendants alleged that the Plaintiff's statement that more information is coming implied that World Mission New Jersey lies to the IRS about the source of and use of its funding.  Yet, the statement in question was not referring to World Mission New Jersey.  Rather, the statement was referring to a World Mission entity in Illinois, or globally to all World Mission entities as a group.

**E.    The Defendants Willfully Misrepresented the Text of the Facebook Post to Mislead the Court Into Believing that It Was Of and Concerning World Mission New Jersey When They Knew It Was Not**

110.    In ¶ 65 of the FAC, and in ¶ 65 of the SAC, the Defendants alleged that Newton had posted a Facebook Post stating that World Mission New Jersey "is 'laundering money'."

111.    In ¶¶ 80-87 of the FAC, in ¶¶ 93-101 of the FAC, in ¶¶ 80-87 of the SAC, and in ¶¶ 93-

101 of the SAC, the Defendants asserted causes of action for conspiracy in which they attempted to hold the Plaintiff liable for the Facebook Post made by Newton.

112.    However, the Defendants knew at all times that the Facebook Post was not of and concerning World Mission New Jersey.

113.    The Defendants had a copy of the Facebook Post in their possession at all times during the pendency of the World Mission Case.

114.    Thus, the Defendants understood that the Facebook Post was made in response to a statement posted by someone calling herself "Mary Brown." To understand the full context of the Facebook Post, both Mary Brown's statement and Newton's statement must be read together:

> <u>Mary Brown</u>: Another thing we need to do is to follow the money trail. If we could find out that these Pastors are rich men rather than the poor, righteous people they say they are, it would be illuminating. My son said his pastor is poor, but then I see him listed as the Secretary for Bigshine Worldwide, Inc. I swear, they are laundering money.
>
> <u>James Newton (Tyler Newton)</u>: they totally have to be laundering money.. Wmscog Ex-Member has tried contacting several agencies, but no one seems to take them seriously.. there is one or two agencies left on the radar though, and one has expressed interest in the records that Ex-Member has accumulated

(capitalization and punctuation errors in original).

115.    In this exchange, the accusation of money laundering was introduced by Mary Brown. Mary Brown never identified a specific branch of the World Mission Enterprise that she was accusing of money laundering. Rather, she was generally referring to the entire World Mission Enterprise as a group.

116.    The only specific reference made by Mary Brown was to her son's pastor, who is also the Secretary for Bigshine Worldwide, Inc. ("Big Shine"). Mary Brown did not identify

which branch her son and his pastor belong to, but to anyone familiar with the World Mission Enterprise and Big Shine, it would have been understood that Mary Brown was referring to a World Mission entity in Illinois, not World Mission New Jersey.

117.   Newton responded to Mary Brown by agreeing with her "money laundering" conclusion, but he was also speaking generally about the World Mission Enterprise as a group.

118.   Alternatively, Newton could have been referring to a World Mission entity in Illinois.

119.   In any case, there was nothing in Newton's statement to indicate that he was referring specifically to World Mission New Jersey.

120.   Nevertheless, when the Defendants quoted from the Facebook Post in ¶ 65 of the FAC, and in ¶ 65 of the SAC, they deliberately edited the quote to make it appear that the statement was of and concerning World Mission New Jersey.

121.   Specifically, in ¶ 65 of the FAC, and in ¶ 65 of the SAC, the Defendants inserted the words "Plaintiff World Mission" before the quoted language "laundering money," thus producing the following allegation:

> Defendant Newton posted on facebook.com, stating that Plaintiff World Mission is "laundering money".

122.   The only purpose of this editing was to create the false appearance that the Facebook Post was of and concerning World Mission New Jersey, even though the Defendants knew it was not.

**III.    THE DEFENDANTS FALSELY CHALLENGED THE AUTHENTICITY OF THE CHALLENGED STATEMENTS PRODUCED BY THE PLAINTIFF, FALSELY CLAIMED THAT OTHER VERSIONS OF THE CHALLENGED STATEMENTS EXISTED AND COULD BE UNCOVERED WITH DISCOVERY, AND MADE FRIVOLOUS ARGUMENTS TO DECEIVE THE COURT AND THE PLAINTIFF WITH RESPECT TO THE OF AND CONCERNING ISSUE.**

123.   The previous section sets forth a number of challenged statements alleged in the FAC and

the SAC that were not of and concerning World Mission New Jersey (the "non-New Jersey statements").

124.   At all times, the Defendants were aware that the non-New Jersey statements were not of and concerning World Mission New Jersey.

125.   Yet, if the Defendants had admitted early in the litigation that the non-New Jersey statements were not of and concerning World Mission New Jersey, then all of the non-New Jersey statements would have been dismissed early in the litigation.

126.   To prevent this from happening, the Defendants deliberately lied to the court and to the Plaintiff, by claiming in the FAC and the SAC that the non-New Jersey statements were actually of and concerning World Mission New Jersey.

127.   The Plaintiff pointed out in a motion to dismiss, filed on August 24, 2012, that the non-New Jersey statements were not of and concerning World Mission New Jersey.[4]

128.   The Defendants responded on November 19, 2012, with a brief containing Miltenberg's and Santori's names in the signature block.  The brief was signed by attorney Diana Zborovsky, who at all times was an employee of the Nesenoff Firm and under the supervision and control of Miltenberg.  Miltenberg and Santori were attorneys of record when and after the brief was filed, and were thus responsible for the accuracy and truthfulness of the brief.  Both Miltenberg and Santori would have been authorized to withdraw or correct any false misrepresentations contained in the brief.

129.   The November 19, 2012 brief contained a frivolous argument designed to deceive the

---

[4] The Plaintiff's first motion to dismiss was filed prior to the filing of the FAC, and was directed at the original Complaint, which was filed by World Mission New Jersey's prior counsel.  The non-New Jersey statements which were alleged in the original Complaint to be of and concerning World Mission New Jersey were substantially similar to the non-New Jersey statements alleged in the FAC and the SAC to be of and concerning World Mission New Jersey.

Court and the Plaintiff with respect to the of and concerning issue.  In that argument, the Defendants claimed that the non-New Jersey statements were of and concerning World Mission New Jersey because the Plaintiff and her husband were only ever members of World Mission New Jersey, and not any other branch of the World Mission Enterprise. Thus, according to the Defendants, the readers would know that the author of the non-New Jersey statements was referring to World Mission New Jersey.

130.   That argument was frivolous.

131.   First of all, the Defendants knew that the non-New Jersey statements were posted online anonymously.

132.   Secondly, the Defendants further knew that the non-New Jersey statements did not contain any references to World Mission New Jersey or any details that could be traced back specifically to World Mission New Jersey.

133.   The Defendants' argument was designed to deceive the court and the Plaintiff.

134.   In an effort to rebut the Defendants' false assertions on the of-and-concerning issue, the Plaintiff made a demand on December 18, 2012, pursuant to the court rules, for the Defendants to produce copies of all of the challenged statements alleged in the pleadings.

135.   The Defendants obviously had such copies in their possession, because they quoted from the challenged statements in both the FAC and the SAC.

136.   Yet, the Defendants refused to produce the challenged statements, because they knew that if they did so the court would discover that World Mission New Jersey was suing mostly over statements that were not of and concerning World Mission New Jersey.

137.   Thus, on December 28, 2012, the Defendants filed a motion for a protective order, supported by a letter brief arguing that they should not have to produce the challenged

statements that were referenced in World Mission New Jersey's pleadings.

138.   The December 28, 2012 letter brief contained Miltenberg's and Santori's names in the signature block.   The letter brief was signed by attorney Diana Zborovsky, who at all times was an employee of the Nesenoff Firm and under the supervision and control of Miltenberg.   Miltenberg and Santori were attorneys of record when and after the letter brief was filed, and were thus responsible for the accuracy and truthfulness of the letter brief.   Both Miltenberg and Santori would have been authorized to withdraw or correct any false misrepresentations contained in the letter brief.

139.   The letter brief alleged, without any competent evidence or even a good faith basis, that the Plaintiff's purpose in demanding the challenged statements was "to bully [World Mission New Jersey] into expending time and money investigating [the] claims . . . ."  In other words, the Defendants asserted that they would need to conduct an "investigation" in order to locate the challenged statements, even though those statements were already described and quoted in World Mission New Jersey's pleadings.

140.   The letter brief further alleged that the challenged statements "could have been (and likely were) removed, modified and adjusted since they were first posted."  In other words, the Defendants alleged that there could be other versions of the statements which would change the legal analysis as to whether the statements were defamatory.  Yet, the Defendants had no competent evidence, and no good faith basis, to support the assertion that the challenged statements had been removed, modified, or adjusted since they were first posted.   In fact, at the time the World Mission Case ended, no such competent evidence had ever emerged.

141.   Meanwhile, the Plaintiff had searched for the challenged statements herself, by looking

online for statements that matched the descriptions provided in World Mission New Jersey's pleadings.

142.  The Plaintiff found most of the challenged statements, and submitted them to the court in support of her motion to dismiss, both with her original motion filed on August 24, 2012, and in her reply papers, filed on December 3, 2012.

143.  As described in the previous section, many of those statements turned out not to be of and concerning World Mission New Jersey.

144.  Had the Defendants admitted that the statements produced by the Plaintiff were in fact the statements they were suing over, then each of the non-New Jersey statements would have been dismissed from the case at the motion to dismiss stage.

145.  Instead, however, the Defendants chose not to tell the truth.

146.  In a January 11, 2013 oral argument on the Plaintiff's motion to dismiss, Santori falsely claimed, repeatedly, that the statements produced by the Plaintiff were not the same as the statements that World Mission New Jersey was suing over.  Santori again claimed, without any factual basis, that there may be other versions of the statements that had been posted online at some point in time, and that the Defendants needed discovery to locate those other versions of the statements.

147.  Santori repeated those claims, again without any factual basis, at a February 13, 2013 telephone conference with the court.

148.  Again, the Defendants never had any good faith basis for believing that there were other versions of the statements.

149.  No other versions of the statements were ever discovered by the time the World Mission Case came to an end.

150.   Also during that February 13, 2013 conference call, Santori asserted that World Mission New Jersey should not have to produce copies of the challenged statements because it would require an "exhaustive search of our records," notwithstanding the fact that the Defendants already had sufficient copies of the challenged statements in their possession to quote directly from them in the FAC and the SAC.  Santori fabricated the "exhaustive search" argument in order to discourage the court from requiring him to produce the challenged statements, which he knew would show that the Plaintiff deserved to prevail on the of and concerning issue.

151.   At all times, the Defendants knew that the non-New Jersey statements produced by the Plaintiff were identical to the statements the Defendants were looking at when drafting the FAC and the SAC, and that they had no factual basis for alleging that there were other versions of the statements that made reference to World Mission New Jersey.

152.   On February 13, 2013, the court ordered World Mission New Jersey to produce copies of the challenged statements by April 15, 2013.

153.   When World Mission New Jersey made that production on or around April 15, 2013, many of the challenged statements were missing from the production.  In particular, most of the non-New Jersey statements were missing.

154.   On information and belief, the Defendants withheld many of the non-New Jersey statements from the production because they did not want to reveal the fact that the statements that World Mission New Jersey was suing over were not of and concerning World Mission New Jersey.

155.   Nevertheless, the Defendants refused to drop the non-New Jersey statements from the case.   In fact, the Defendants subsequently re-alleged each of the non-New Jersey

statements when they filed the SAC on April 24, 2013.

156.   On May 21, 2013, the Defendants submitted a brief in opposition to a revised motion to dismiss brought by the Plaintiff.   In that brief, Miltenberg's and Santori's names again appeared in the signature block.   The brief was signed by attorney Diana Zborovsky, who at all times was an employee of the Nesenoff Firm and under the supervision and control of Miltenberg.   Miltenberg and Santori were attorneys of record when and after the brief was filed, and were thus responsible for the accuracy and truthfulness of the brief.   Both Miltenberg and Santori would have been authorized to withdraw or correct any false misrepresentations contained in the brief.

157.   In the May 21, 2013 brief, the Defendants repeated their argument from their November 19, 2012 brief asserting that the non-New Jersey statements were of and concerning World Mission New Jersey because the Plaintiff and her husband were only ever members of World Mission New Jersey, and not any other branch of the World Mission Enterprise.     As explained above, the non-New Jersey statements were written anonymously and lacked detail relating to World Mission New Jersey.   Thus, the Defendants' argument was frivolous and was designed to deceive the court and the Plaintiff.

158.   Also in the May 21, 2013 brief, the Defendants asserted an additional argument on the of and concerning issue, saying that:

> The Complaint alleges that she posted the reviews under the very same usernames - the same usernames she used to explain her affiliation with [World Mission New Jersey].

159.   That assertion was false.   In fact, none of World Mission New Jersey's pleadings – neither the original Complaint, nor the FAC, nor the SAC – alleged that the Plaintiff had

used the same usernames for both the non-New Jersey statements and the statements in the Five-Part Story in which the Plaintiff explained her affiliation with World Mission New Jersey.  To the contrary, each of the pleadings alleged that the non-New Jersey statements were posted under aliases such as "Hailey," "HaileyStevens," or variations thereof.  On the other hand, the statements in the Five-Part Story that describe the experience of the Plaintiff and her husband in World Mission New Jersey were not alleged to have been posted under an alias, and in fact they were posted anonymously without any alias at all.

160. Thus, the assertion made in the May 21, 2013 brief was false and frivolous, and was included for the sole purpose of deceiving the court and the Plaintiff, and to cover-up for the fact that the Defendants had alleged defamation with respect to statements that they knew were not of and concerning their client.

161. For the remainder of the litigation, the Defendants refused to withdraw their allegations that the non-New Jersey statements were of and concerning World Mission New Jersey.

162. On February 10, 2014, the court ordered World Mission New Jersey to produce copies of all of the online challenged statements by March 31, 2014.

163. The only statements the Defendants were able to produce in response to that order were the Five-Part Story, the PVSA Article, a statement that had been posted to kudzu.com, and a statement that had been posted to aidpage.com.  Except for those four statements, none of the challenged statements alleged in the FAC and the SAC were produced.  The alternative versions of the statements that had been promised by Santori never materialized.  In other words, except for those four statements, the Defendants had no competent evidence, and no good faith basis, for alleging that the challenged statements

set forth in the FAC and the SAC were of and concerning World Mission New Jersey, or that such statements had ever even existed. Yet, even though the Defendants knew that they had no competent evidence to support claims arising out of such statements, they still did not withdraw their claims with respect to those statements.

164.   Thus, the Plaintiff was forced to litigate those statements all the way to summary judgment, where she finally prevailed.

165.   By falsely editing the statements in the FAC and the SAC, by falsely claiming that other versions of the statements existed and could be uncovered with discovery, by making frivolous arguments to deceive the court and the Plaintiff with respect to the of and concerning issue, and by falsely challenging the authenticity of the versions of the challenged statements produced by the Plaintiff in support of her motions to dismiss, the Defendants forced the Plaintiff to endure legal fees, costs, and emotional distress in defense of frivolous claims.

**IV.     THE DEFENDANTS FALSELY REFUTED THE AUTHENTICITY OF THE FIVE-PART STORY, THE PVSA ARTICLE, AND WORLD MISSION NEW JERSEY'S OWN WEBSITE**

166.   Every time the Plaintiff produced evidence to refute one of World Mission New Jersey's allegations, the Defendants would attack the authenticity of the Plaintiff's evidence, without having a good faith basis for doing so.

167.   For instance, the Defendants falsely challenged the authenticity of World Mission New Jersey's own photographs showing gender-segregation taking place within World Mission New Jersey.

168.   The Defendants falsely challenged the authenticity of World Mission New Jersey's own webpage describing the relationship between World Mission New Jersey and its

headquarters in South Korea.

169. The Defendants falsely challenged the authenticity of World Mission New Jersey's own webpage touting the benefits of overcoming a lack of sleep.

170. The Defendants even falsely challenged the authenticity of the Five-Part Story and the PVSA Article – the same documents that World Mission New Jersey was suing over.

### A. The Defendants Challenged the Authenticity of Gender-Segregation Photographs Without a Good Faith Basis

171. The issue of family or gender segregation was raised in one of the challenged statements.

172. Specifically, in ¶ 39 of the FAC, and in ¶ 39 of the SAC, the Defendants alleged that the Plaintiff stated in an online article that "I noticed that married couples and families did not study together unless there was a longer study being offered on a Sunday afternoon."

173. In those same paragraphs, the Defendants went on to explain that the challenged statement was false, and that the Plaintiff "could never have noticed that married couples and families 'did not study together unless there was a longer study being offered' because couples frequently study together, and often studied together in the presence of [the Plaintiff]."

174. The FAC and the SAC even asserted, rather brazenly, that "The statement implies that [World Mission New Jersey] separates families when it does not."

175. Yet, World Mission New Jersey does in fact separate families.

176. World Mission New Jersey actually adheres to a strictly enforced policy of segregating the men and women during study sessions and worship services.

177. In fact, World Mission New Jersey actually holds itself out to the world as an organization that segregates men and women as part of its "religious" practice.

178. Specifically, World Mission New Jersey publishes photographs on its website showing

men and women separately attending study sessions, and sitting separately at worship services.

179.   The Plaintiff produced such photographs during the litigation, and submitted them to the court in support of her motion to dismiss on December 3, 2012 (the "Gender Segregation Photographs").

180.   The Defendants knew that the Gender Segregation Photographs produced by the Plaintiff were authentic pictures taken from World Mission New Jersey's website, because World Mission New Jersey's website was available to anyone with internet access.

181.   Nevertheless, at the January 11, 2013 oral argument for the Plaintiff's motion to dismiss, Santori lied to the court and falsely represented to the court that the Gender Segregation Photographs could not be authenticated.

182.   In fact, Santori tried to convince the court that World Mission New Jersey does not regularly engage in the practice of segregating men and women.

183.   Rather, Santori tried to explain away the Gender Segregation Photographs by suggesting to the court that on one occasion - at various World Mission locations around the world – World Mission segregated the men and women, took pictures, put the pictures on World Mission's official website, and then never segregated the men and women again after that.

184.   Santori never had a good faith basis for believing that was the case.

185.   In fact, it was not the case - it was a lie.

186.   Miltenberg never attempted to correct Santori's false representation.

187.   World Mission New Jersey does in fact segregate men and women on a daily basis.

188.   Nevertheless, the Defendants challenged the authenticity of the Gender Segregation Photographs without any competent evidence, or even a good faith basis, for doing so.

189. World Mission New Jersey subsequently admitted in response to one of the Plaintiff's interrogatories that the website from which the Plaintiff obtained the Gender-Segregation Photographs was in fact World Mission New Jersey's website.

190. Thus, the Defendants knew that they were lying when they asserted that the Gender-Segregation Photographs were not authentic.

191. Although the Defendants knew that the Gender Segregation Photographs were authentic, the Defendants relied on the false representation that they were not authentic to help their client, World Mission New Jersey, defeat the Plaintiff's motion to dismiss.

**B.**   **The Defendants Challenged the Authenticity of a World Mission New Jersey Webpage Describing World Mission New Jersey's Relationship With Its South Korean Headquarters, Without a Good Faith Basis**

192. In ¶ 34 of the FAC, and in ¶ 34 of the SAC, the Defendants alleged that the Plaintiff posted the following statement on the Ross Site:

> "Does the organization control or is it controlled by any other organization?". The WMSCOG checked off "NO". The WMSCOG locations are NOT independent and are all controlled by the main location in Seoul, S. Korea. Why would they answer "NO" to this question?

193. With respect to the statement asserting that World Mission entities are "controlled by the main location" in South Korea, World Mission New Jersey's own website described its relationship with the main location in South Korea like this:

> The Head Office of the World Mission Society Church of God is the center of the 1,400 local Churches of God throughout the world, and it supports each local Church with preaching, education, administration, management, overseas mission, and culture & arts, so that they can spread the message of salvation to all peoples, following the will of Elohim.

194. On December 3, 2012, the Plaintiff filed a copy of that webpage (the "Head Office Webpage") in support of her motion to dismiss.

195.   At the January 11, 2013 oral argument, Santori lied to the court and asserted that the Head Office Webpage could not be authenticated.

196.   In fact, the Head Office Webpage produced by the Plaintiff really was an authentic copy of World Mission New Jersey's own webpage.

197.   Miltenberg never attempted to correct Santori's false representation.

198.   The Defendants knew at all times that the Head Office Webpage was in fact an authentic copy of a webpage taken from World Mission New Jersey's website.

199.   Nevertheless, the Defendants challenged the authenticity of the Head Office Webpage without any competent evidence, or even a good faith basis, for doing so.

200.   World Mission New Jersey subsequently admitted in response to one of the Plaintiff's interrogatories that the website from which the Plaintiff obtained the Head Office Webpage was in fact World Mission New Jersey's website.

201.   Thus, the Defendants knew that they were lying when they asserted that the Head Office Webpage was not authentic.

202.   Although the Defendants knew that the Head Office Webpage was authentic, the Defendants relied on the false representation that it was not authentic to help World Mission New Jersey defeat the Plaintiff's motion to dismiss.

   **C.    The Defendants Challenged the Authenticity of a World Mission New Jersey Webpage Touting the Benefits of Sleep Deprivation, Without a Good Faith Basis**

203.   In ¶ 56 of the FAC, and in ¶ 56 of the SAC, the Defendants alleged that, in the Destroys Families Video, the Plaintiff stated that "The World Mission Society Church of God uses sleep deprivation as a means to make their members more vulnerable to the indoctrination process."

204. Yet, World Mission New Jersey's own website contained a page discussing the virtue of overcoming a lack of sleep ("Sleep Deprivation Webpage").

205. On December 3, 2012, the Plaintiff filed a copy of the Sleep Deprivation Webpage in support of her motion to dismiss.

206. At the January 11, 2013 oral argument, Santori lied to the court and asserted that the Sleep Deprivation Webpage could not be authenticated.

207. In fact, the Sleep Deprivation Webpage produced by the Plaintiff really was an authentic copy of World Mission New Jersey's own webpage.

208. Miltenberg never attempted to correct Santori's false representation.

209. The Defendants knew at all times that the Sleep Deprivation Webpage was in fact an authentic copy of a webpage taken from World Mission New Jersey's website.

210. Nevertheless, the Defendants challenged the authenticity of the Sleep Deprivation Webpage without any competent evidence, or even a good faith basis, for doing so.

211. World Mission New Jersey subsequently admitted in response to one of the Plaintiff's interrogatories that the website from which the Plaintiff obtained the Sleep Deprivation Webpage was in fact World Mission New Jersey's website.

212. Thus, the Defendants knew that they were lying when they asserted that the Sleep Deprivation Webpage was not authentic.

213. Although the Defendants knew that the Sleep Deprivation Webpage was authentic, the Defendants relied on the false representation that it was not authentic to help World Mission New Jersey defeat the Plaintiff's motion to dismiss.

**D.    The Defendants Challenged the Authenticity of the Five-Part Story and the PVSA Article – the Same Articles That World Mission New Jersey Was Suing Over**

31

214.   In ¶¶ 38-48 of the FAC, and in ¶¶ 38-48 of the SAC, World Mission New Jersey alleged that various statements contained in the Five-Part Story were defamatory.

215.   In ¶¶ 49-52 of the FAC, and in ¶¶ 49-52 of the SAC, World Mission New Jersey alleged that various statements contained in the PVSA Article were defamatory.

216.   The Plaintiff had included copies of the Five-Part Story and the PVSA Article with her motion to dismiss papers, filed on August 24, 2012.

217.   Yet, at the oral argument on January 11, 2013, Santori lied to the court and asserted that the Five-Part Story and the PVSA Article produced by the Plaintiff could not be authenticated.

218.   Santori made that assertion even though the Defendants had been looking at the Five-Part Story and the PVSA Article when they drafted the FAC and the SAC.

219.   In fact, the Defendants quoted directly from the Five-Part Story and the PVSA Article when they drafted the FAC and the SAC, so they necessarily had to have copies of the articles in their possession.

220.   Thus, the Defendants knew that the copies of the Five-Part Story and the PVSA Article produced by the Plaintiff were identical in substance to the ones that the Defendants had been relying on when drafting the FAC and the SAC.

221.   Nevertheless, Santori falsely declared that the Five-Part Story and the PVSA Article produced by the Plaintiff could not be authenticated.

222.   Miltenberg never attempted to correct Santori's false representation.

223.   The Defendants knew at all times that the Five-Part Story and the PVSA Article produced by the Plaintiff were in fact authentic copies of the articles that World Mission New Jersey was suing over.

224.    Nevertheless, the Defendants challenged the authenticity of the Five-Part Story and the PVSA Article produced by the Plaintiff without any competent evidence, or even a good faith basis, for doing so.

225.    World Mission New Jersey subsequently produced their own versions of the Five-Part Story and the PVSA Article in response to discovery demands made by the Plaintiff.

226.    The text in the versions of the Five-Part Story and the PVSA Article produced by World Mission New Jersey turned out to be identical to the versions produced by the Plaintiff on August 24, 2012.

227.    Thus, the Defendants knew that they were lying when they asserted that the Five-Part Story and the PVSA Article produced by the Plaintiff were not authentic.

228.    Although the Defendants knew that the Five-Part Story and the PVSA Article produced by the Plaintiff were authentic, the Defendants relied on the false representation that they were not authentic to help World Mission New Jersey defeat the Plaintiff's motion to dismiss.

## V.    THE DEFENDANTS ALLOWED THEIR CLIENT TO SUE THE PLAINTIFF FOR TRADE LIBEL WITHOUT EVER INTENDING TO PRODUCE EVIDENCE OF SPECIAL DAMAGES

229.    In ¶¶ 107-16 of the FAC, and in ¶¶ 107-16 of the SAC, the Defendants asserted a cause of action for trade libel.

230.    In New Jersey, a cause of action for trade libel by a nonprofit organization or a church requires the plaintiff to disclose the specific amounts of donations that were lost, or the specific names of donors, that were lost, as a result of the defendant's conduct.

231.    Yet, the Defendants never intended to disclose any specific amounts of donations that World Mission New Jersey lost as a result of the challenged statements.

232.   Nor did the Defendants ever intend to disclose the names of any donors who stopped contributing money to World Mission New Jersey as a result of the challenged statements.

233.   In fact, the Defendants never made such disclosures at any time during the litigation.

234.   The reason the Defendants did not make any such disclosures during the litigation was because World Mission New Jersey did not lose any donations or donors as a result of the challenged statements.

235.   The Defendants never had a good faith basis for believing that World Mission New Jersey had lost donations or donors as a result of the challenged statements.

236.   In order to cover up for the fact that they knew that World Mission New Jersey had not lost any donations or donors as a result of the challenged statements, the Defendants came up with bizarre excuses for not producing the names of World Mission New Jersey's alleged lost donors.

237.   For instance, the Defendants argued that the disclosure of World Mission New Jersey's lost donors would violate the free association rights of the lost donors.  The Defendants compared the lost donors with African-Americans who had joined the NAACP in the Deep South during the Segregation Era.  The Defendants argued that World Mission New Jersey should not have to disclose lost donors for the same reason that the NAACP won a court ruling saying that it did not have to disclose its members.  Yet, the Defendants never had a good faith basis for comparing World Mission New Jersey to the NAACP.  African-Americans in the Deep South during Segregation would have been subject to lynching and other forms of violence if their associations with the NAACP had been disclosed.  World Mission New Jersey's former donors, on the other hand, have never

been subjected to such violence and abuse.

238. More importantly, on information and belief, none of World Mission New Jersey's former donors had ever even asked World Mission New Jersey or the Defendants to keep their association with World Mission New Jersey a secret.

239. In other words, the Defendants asserted the rights of third parties who had not asked to assert such rights, and then cited to those purported third-party rights as an excuse not to disclose the names of those third parties – even though the disclosure of such third parties was required as an element of World Mission New Jersey's trade libel claim.

240. The Defendants engaged in this deception in order to avoid disclosing to the court the fact that World Mission New Jersey had not experienced any lost donors or lost donations as a result of the challenged statements.

**VI.   THE DEFENDANTS ALLOWED THEIR CLIENT TO SUE THE PLAINTIFF FOR STATEMENTS MADE IN THE PVSA ARTICLE THAT WERE VERIFIABLY TRUE, WITHOUT A GOOD FAITH BASIS FOR BELIEVING THE STATEMENTS WERE FALSE**

241. In ¶¶ 49-52 of the FAC, and in ¶¶ 49-52 of the SAC, the Defendants alleged that the Plaintiff defamed World Mission New Jersey by posting the PVSA Article, which was entitled "The WMSCOG 'Awarded by President Obama'?", on the Examining Website.

242. The PVSA Article criticized World Mission New Jersey for the manner in which it received the Presidential Volunteer Service Award from the Points of Light Institute.

243. The purpose of the Presidential Volunteer Service Award is to thank and honor Americans who, by their demonstrated commitment and example, inspire others to engage in volunteer service.

244. The Presidential Volunteer Service Award is given to individual people and organizations based on the number of volunteer hours that they devote to public service.

245. Under the rules for the award program, organizations are permitted to certify the volunteer hours of their own people and other branches of the same organization.

246. However, in order to preserve the integrity of the award, there is supposed to be separation between the organization that certifies the volunteer hours and the people or branches of the organization that receive the award.

247. Thus, the certifying organization is not supposed to certify its own hours, because that would result in the certifying organization, in effect, giving itself the award, creating an apparent conflict of interest.

248. Yet, this is precisely what World Mission New Jersey did.  In addition to certifying hours for World Mission New Jersey members, and for other World Mission entities, World Mission New Jersey also certified hours for itself.

249. Thus, World Mission New Jersey was both the certifying organization for the award, and the recipient of the award, creating an apparent conflict of interest.

250. The PVSA Article pointed out this conflict of interest, and expressed criticism of World Mission New Jersey because of it.

251. The PVSA Article also complained that one of the awards was given to World Mission New Jersey's president, Joo Cheol Kim, who is not a United States citizen, as the rules of the award program require.

252. All of the facts presented in the PVSA Article were true.

36

253.  Moreover, the Plaintiff had contacted a representative from the Points of Light Institute prior to publishing the PVSA Article.  That representative confirmed that World Mission New Jersey should not have certified its own hours and given itself the award.

254.  The fact that the Plaintiff's communication with the representative had occurred was disclosed in the PVSA Article itself.

255.  Yet, in ¶ 51 of the FAC, and in ¶ 51 of the SAC, the Defendants alleged that "no 'representative' of the Presidential Volunteer Service Award office ever advised [the Plaintiff] that 'the WMSCOG should not have nominated their Ridgewood, New Jersey location for the award.'"

256.  The Defendants never had any competent evidence, or even a good faith basis, to support the allegation that the communication between the Plaintiff and the representative had not occurred.

257.  Yet, the Defendants refused to withdraw that allegation.

258.   On January 11, 2013, Santori argued to the court, in opposition to the Plaintiff's motion to dismiss, that the reason he still thought the PVSA Article claim was valid was because he did not believe that the Plaintiff's communication with the representative had actually occurred.

259.  In fact, Santori argued to the court that the reason he did not believe that the Plaintiff's communication with the representative had occurred was because, according to Santori, the rule set forth by the Plaintiff - saying that a certifying organization is permitted to certify the volunteer hours of its own people and other branches of the same organization - was not actually the rule that governs the award program.

260.    In other words, Santori was challenging the Plaintiff's interpretation of the PVSA rules.

261.    Yet, the rule set forth by the Plaintiff was exactly the same rule that was set forth by the Defendants in the FAC and the SAC.

262.    In ¶ 51 of the FAC, and in ¶ 51 of the SAC, the Defendants admitted that the rule governing the program is that a certifying organization is permitted to certify the volunteer hours of its own people and other branches of the same organization.

263.    Thus, Santori's challenging of the rule was done in bad faith, and Miltenberg never corrected Santori's statement challenging the rule.

264.    On April 30, 2013, in support of the Plaintiff's revised motion to dismiss, the Plaintiff filed with the court an audio recording of a telephone conversation between Newton and the Points of Light Institute representative in which the representative unequivocally stated that World Mission New Jersey should not have certified its own hours and given itself the award.

265.    After receiving that audio recording, and even though the audio recording proved that the Defendants had no good faith basis for pursuing World Mission New Jersey's claims over the PVSA Article, the Defendants still refused to drop the claims over the PVSA Article.

**CLAIMS FOR RELIEF**

**CAUSE OF ACTION #1**

**ATTORNEY DECEIT / N.Y. JUDICIARY LAW § 487**

**(Against Miltenberg & Santori)**

266.    The Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs.

267.    New York Judiciary Law § 487 provides that:

An attorney or counselor who:

1.  Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party; or,

2.  Wilfully delays his client's suit with a view to his own gain; or, wilfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for,

Is guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

268. At all relevant times, Defendants Miltenberg and Santori were attorneys licensed by the State of New York.

269. At all relevant times, Defendants Miltenberg and Santori relied on their New York attorney licenses to support their pro hac vice admission to the New Jersey court in which the World Mission Case was pending.

270. But for their New York attorney licenses, Defendants Miltenberg and Santori would not have been able to participate in the World Mission Case, and would not have been able to commit the acts and omissions alleged herein.

271. Moreover, at all relevant times, Defendants Miltenberg and Santori operated out of the office of the Nesenoff Firm, which at all relevant times was located in New York.

272. Therefore, Defendants Miltenberg and Santori are subject to New York law regulating attorney conduct, and are subject to liability under New York Judiciary Law § 487.

273. From the time Miltenberg entered the World Mission Case in the fall of 2012 to the time the suit was dismissed in 2015, Miltenberg, in collusion with his client, World Mission New Jersey, deceived the Superior Court of the State of New Jersey and the Plaintiff

herein by seeking to sustain the suit with totally bogus claims unsupported by competent evidence, and with false representations known by him to be false.

274.   Thus, Miltenberg's conduct was chronic and persistent.

275.   From the time Santori entered the World Mission Case in the fall of 2012 to the time he left the Nesenoff Firm in mid-2013, Santori, in collusion with his client, World Mission New Jersey, deceived the Superior Court of the State of New Jersey and the Plaintiff herein by seeking to sustain the suit with totally bogus claims unsupported by competent evidence, and with false representations known by him to be false.

276.   Thus, Santori's conduct was chronic and persistent.

277.   As part of that chronic and persistent conduct, Defendants engaged in the following acts and omissions in violation of New York Judiciary Law § 487:

1)   The Defendants placed their names on the FAC, and caused it to be filed on or around January 28, 2013, while knowing that it was riddled with material false representations and allegations that no competent evidence could support.

2)   The Defendants placed their names on the SAC, and caused it to be filed on or around April 24, 2013, while knowing that it was riddled with material false representations and allegations that no competent evidence could support.

3)   The Defendants deliberately edited the non-New Jersey statements to mislead the court and the Plaintiff into believing that they were of and concerning World Mission New Jersey even though the Defendants knew they were not.  After it was pointed out to the Defendants that the non-New Jersey statements they were suing over were not of and concerning World Mission New Jersey, the Defendants

refused to withdraw the claims relating to those statements, and instead made frivolous arguments to justify keeping the non-New Jersey statements in the case.

4) The Defendants falsely challenged the authenticity of the challenged statements produced by the Plaintiff and falsely claimed that other versions of the challenged statements existed and could be uncovered with discovery, and they did so without any competent evidence or good faith basis to justify their position.

5) The Defendants falsely refuted the authenticity of the webpages and photographs from World Mission New Jersey's own website, including the Gender-Segregation Photographs, the Head Office Webpage, and the Sleep Deprivation Webpage, all of which were authentic, and they did so without any competent evidence or good faith basis to justify their position.

6) The Defendants falsely refuted the authenticity of the Plaintiff's production of the Five-Part Story and the PVSA Article, even though they were identical to the documents that the Defendants were quoting from when they drafted the FAC and the SAC, and which the Defendants subsequently produced.

7) The Defendants allowed their client to sue the Plaintiff for trade libel without ever intending to produce evidence of special damages, as the tort of trade libel requires, and without ever being in possession of evidence of special damages, or having a good faith basis for believing that there could be such evidence.  When the Plaintiff began to demand proof of special damages, the Defendants created frivolous arguments to avoid having to show their proofs.

8)     The Defendants allowed their client to sue the Plaintiff for statements made in the PVSA Article which were verifiably true, and without having any good faith basis for believing the statements were false and defamatory.

278.   The World Mission Case was entirely without merit from the time the Defendants entered the case to the time the case was dismissed.

279.   Yet, the Plaintiff was required to defend herself against the false claims by hiring a lawyer to engage in extensive motion practice, discovery, investigation, and other legal work.

280.   In defending herself, the Plaintiff incurred legal fees in the amount of $742,784.00, which were incurred as a direct and proximate result of the Defendants' conduct.

281.   In defending herself, the Plaintiff incurred expenses in the amount of $4,496.59, which were incurred as a direct and proximate result of the Defendants' conduct.

282.   As a direct and proximate result of the Defendants' conduct, the Plaintiff was further damaged, in that she experienced severe emotional pain and mental anguish, including but not limited to depression, nervousness, grief, anxiety, worry, shock, humiliation, indignity, fright, mortification, embarrassment, apprehension, and terror, for which she is entitled to be compensated in an amount to be determined at trial.

283.   Under New York Judiciary Law § 487, the Plaintiff is entitled to have all of her compensatory damages trebled.

284.   The acts and omissions of the Defendants, as alleged herein, were willful or wanton.

285.   The acts and omissions of the Defendants, as alleged herein, were actuated by actual malice.

286. The acts and omissions of the Defendants, as alleged herein, were accompanied by a conscious and deliberate disregard of persons who foreseeably might be harmed by those acts or omissions.

287. The acts and omissions of the Defendants, as alleged herein, amount to such gross, wanton or willful fraud, dishonesty, or malicious wrongdoing as to involve a high degree of moral culpability, making it appropriate to deter the Defendants from engaging in similar conduct in the future through the imposition of punitive damages.

## CAUSE OF ACTION #2

## VICARIOUS LIABILITY FOR ACTS OF EMPLOYEES OR AGENTS

### (Against the Nesenoff Firm)

288. The Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs.

289. Miltenberg and Santori were each employees of the Nesenoff Firm when they committed the acts and omissions alleged herein.

290. At all relevant times, Miltenberg and Santori were each acting within the scope of their employment with the Nesenoff Firm.

291. At all relevant times, the Nesenoff Firm had the right to control the manner in which the work at issue was performed by Miltenberg and Santori.

292. At all relevant times, the Nesenoff Firm had the right to control the method of payment for the work at issue performed by Miltenberg and Santori.

293. Therefore, the Nesenoff Firm is vicariously liable for the actions and omissions of Miltenberg and Santori, by operation of law under the doctrine of respondeat superior,

and is responsible for all of the compensatory, punitive, and other damages attributed to Miltenberg and Santori, as alleged herein.

## DEMAND FOR RELIEF

WHEREFORE, the Plaintiff demands judgment be entered for:

1) the total legal fees and expenses which were incurred or paid by the Plaintiff in connection with her defense of the World Mission Case, in an amount to be determined at trial, plus interest at the rate of nine percent per annum from the date on which each fee or expense was incurred or paid, and the total amount trebled;

2) compensatory damages for emotional distress suffered by the Plaintiff in connection with her defense of the World Mission Case, in an amount to be determined at trial, plus interest at the rate of nine percent per annum from the date on which each emotional damage was suffered, and the total amount trebled;

3) punitive damages in an amount to be determined at trial;

4) filing fees;

5) reasonable costs of suit;

6) reasonable attorney's fees;

7) reasonable post-judgment interest on all monetary awards; and

8) such other and further relief which, in light of all of the facts and circumstances, this Court may determine to be just and equitable.

## JURY DEMAND

The Plaintiff demands trial by jury on all issues so triable.

Dated:  September 2, 2016                    By:     s/ PAUL S. GROSSWALD
                                                      **PAUL S. GROSSWALD**
                                                      Attorney for the Plaintiff,
                                                      **Michele Colón**